# CITY OF OAK CREEK, Plaintiff-Respondent,

## v.

# Peter Ah KING, Defendant-Appellant.

Supreme Court

*No. 87-1305. Argued November 30, 1988.—Filed February 23, 1989.*

(Also reported in 436 N.W.2d 285.)

For the defendant-appellant there were briefs (in court of appeals) by *Robert A. Christensen* and *Foley & Lardner,* Milwaukee, and oral argument by *Mr. Christensen.*

For the plaintiff-respondent there was a brief (in court of appeals) and oral argument by *Lawrence J. Haskin,* Oak Creek.

LOUIS J. CECI, J.   This case is before this court on certification from the court of appeals, pursuant to sec. (Rule) 809.61, Stats. The defendant-appellant (appellant) appeals from a judgment of the circuit court for Milwaukee county, Clarence R. Parrish, circuit judge, finding the appellant guilty of disorderly conduct in violation of City of Oak Creek Municipal Ordinance Sec. 9:947:01. The appellant raises three issues for review. The first issue is whether the appellant's conduct in this case constitutes disorderly conduct under City of Oak Creek Municipal Ordinance Sec. 9:947:01. The second issue is whether the City of Oak Creek Municipal Ordinance Sec. 9:947:01, as applied, is void for vagueness. The third issue is whether the appellant as a news gatherer had a right of access to the scene of this airplane crash beyond the general public's right to access under the first and fourteenth amendments to the United States Constitution, art. I, sec. 3 of the Wisconsin Constitution, or Wisconsin law. We

affirm the decision of the circuit court finding the appellant guilty of disorderly conduct in violation of sec. 9:947:01. In addition, we hold that sec. 9:947:01 as applied in this case is not unconstitutionally vague. Finally, we hold that the appellant as a news gatherer had no first amendment right of access to the scene of this airplane crash beyond the general public's right to access.

The facts of this case are as follows. At approximately 3:20 p.m. on September 6, 1985, Midwest Express Flight 105 crashed shortly after takeoff from General Mitchell Field in the city of Oak Creek, Milwaukee county, Wisconsin. The crash occurred in a nonpublic area which is owned by Milwaukee county and is administered by the General Mitchell Field airport administration.

Shortly after the crash occurred, Lieutenant Thomas Orlick of the Milwaukee county sheriff's department, who was in charge of airport security, ordered the crash site secured, i.e., that officers should keep everyone out except emergency personnel and equipment. Pursuant to this order, a roadblock was established on East College Avenue just east of the intersection of East College Avenue and South Howell Avenue by Detective Virgil White and another officer of the Oak Creek police department. East College Avenue provided the sole means of direct access to the crash site by emergency vehicles and personnel. Detective White was given instructions to prohibit any traffic except emergency vehicles from traveling farther east on East College Avenue. Detective White testified that at approximately 4:00 p.m., a light-colored, unmarked sedan proceeded through the roadblock, heading east on East College Avenue, by following an emergency vehicle through the roadblock. Detective White was forced to

leave his post at the roadblock to pursue the unmarked sedan which went through the roadblock without stopping.

Detective White located the vehicle parked on East College Avenue near an access road which led to the crash site. As Detective White approached the vehicle from behind, the four occupants of the vehicle, who were employed by WTMJ-TV of Milwaukee, were getting their camera equipment from the trunk of the vehicle. Detective White informed the four individuals that they were in a restricted area and that they would have to leave. One of the individuals then asked Detective White if they, with the exception of the driver, could walk back to the nonrestricted area along East College Avenue. Detective White agreed with this arrangement. The appellant, however, appeared to have not heard Detective White's order, because the appellant started to walk away from Detective White along the right side of the vehicle in which he had been riding. Detective White walked over to the appellant and advised him that he was also addressing him and that he would also have to leave.

At this point, the driver turned the vehicle around and proceeded west on East College Avenue, away from the restricted crash area. The three remaining individuals, including the appellant, started to walk back on East College Avenue toward the roadblock, also in a westerly direction. As the appellant approached an area known as the Michael F. Cudahy Nature Preserve, located south of East College Avenue and to the west of the crash site, the appellant jumped over a fence which separated the public road from the nonpublic portion of the airport to the south. Detective White's testimony indicates that there were approximately five individuals in the immediate area at this time who had not crossed

the fence. "No Trespassing" signs were posted on this fence. The appellant then proceeded to run approximately 20 to 30 yards to the top of a small hill.

Detective White, who had been observing the appellant's actions, got back into his vehicle and drove to the point at which the appellant had crossed the fence. He told the two associates of the appellant to leave the restricted area, which they did. Detective White then crossed over the fence and pursued the appellant up the hill. He caught up with the appellant at the top of the hill, where the appellant appeared to be taking pictures of the crash site. Detective White once again told the appellant to leave the restricted area. The appellant refused to leave the restricted area and stated that he would not leave unless he was arrested. Detective White then arrested the appellant for disorderly conduct.[1]

The General Mitchell Field Media Guide for Airport Emergencies, which was introduced at trial, provides that "no representative of the media will be permitted to enter non-public/restricted areas of the airport without an authorized escort." The reason for the escort system, according to the guide, is that such a system is an accommodation between the news media's

---

[1] See map at page 555. Detective White testified to the following in circuit court in regard to the map. College Avenue is north of the crash site, and Howell Avenue is located west of the crash site. The airport terminal is located north of College Avenue. Detective White established the roadblock across College Avenue at the entrance to the 440th Air Wing. Letter "A" indicates the location where Detective White located the sedan that the appellant had been riding in. Letter "B" indicates the location where Detective White arrested the appellant. The dashed line indicates the crest of the hill. Finally, letter "C" indicates the corner of the fence which runs along College Avenue to the south.

primary responsibility to cover situations at the county's airport that at times are dramatic and of major interest to the public and the airport staff's primary responsibility to control the situation and render emergency services as needed. At 4:30 p.m., Mr. Barry Bateman, the airport director, held a briefing for the media representatives in his office. The meeting lasted approximately 15 minutes. Immediately thereafter, Mr. Bateman took the media representatives directly to the crash site to take photographs or film the scene.

On September 23, 1986, the appellant was adjudged guilty in the city of Oak Creek municipal court of disorderly conduct under City of Oak Creek Municipal Ordinance Sec. 9:947:01. On February 13, 1987, the Milwaukee county circuit court, pursuant to sec. 800.14, Stats., conducted a trial *de novo* and found the defendant guilty of disorderly conduct in violation of sec. 9:947:01. Judgment was entered on June 30, 1987. On July 15, 1987, the appellant appealed his conviction to the court of appeals. On March 17, 1988, the court of appeals requested certification to this court, which we granted.

## WHETHER THE APPELLANT'S CONDUCT IN THIS CASE CONSTITUTES DISORDERLY CONDUCT UNDER SEC. 947.01, STATS., AS ADOPTED BY CITY OF OAK CREEK MUNICIPAL ORDINANCE SEC. 9:947:01

This issue presents a question as to the application of law to uncontroverted facts. Questions involving statutory construction are afforded independent review without the necessity of deferring to the conclusions of the lower court. *Kania v. Airborne Freight Corp.*, 99

Wis. 2d 746, 758–59, 300 N.W.2d 63 (1981). The appellant was charged with and convicted of a violation of City of Oak Creek Municipal Ordinance Sec. 9:947:01, adopting sec. 947.01, Stats., which provides:

> **947.01 Disorderly Conduct.** Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

In *State v. Givens*, 28 Wis. 2d 109, 115, 135 N.W.2d 780 (1965), this court held that there are two distinct elements of disorderly conduct under sec. 947.01(1), Stats. (1965).[2] First, the conduct must be of the type enumerated in the statute or similar thereto in having a tendency to disrupt good order. Second, the conduct must be engaged in under circumstances which tend to cause or provoke a disturbance. *See also State v. Zwicker*, 41 Wis. 2d 497, 515, 164 N.W.2d 512, *appeal dismissed sub nom. Zwicker v. Wisconsin*, 396 U.S. 26 (1969).

---

[2]Section 947.01, Stats. (1965), provided as follows:

**947.01 Disorderly conduct.** Whoever does any of the following may be fined not more than $100 or imprisoned not more than 30 days:

(1) In a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke a disturbance; or

(2) With intent to annoy another, makes a telephone call, whether or not conversation ensues.

In 1979, the Wisconsin legislature repealed subsection (2). See ch. 131, Wis. laws of 1979.

A review of the record demonstrates that the appellant's conduct does not fall directly into any of the specifically enumerated categories forbidden by sec. 9:947:01. Therefore, the question becomes whether there are any facts in this situation which would sustain the conclusion that the appellant's conduct was "otherwise disorderly."

In *Givens,* this court held in regard to sec. 947.01(1), Stats. (1965), "When the statute, after the specific enumerations, in a 'catchall' clause proscribes 'otherwise disorderly conduct' which tends to 'provoke a disturbance,' this must mean conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *Givens,* 28 Wis. 2d at 115.

> "'While it is impossible to state with accuracy just what may be considered in law as amounting to disorderly conduct, the term is usually held to embrace all such acts and conduct as are of a nature to corrupt the public morals or to outrage the sense of public decency, whether committed by words or acts.'"

*Id.* at 116, quoting *Teske v. State,* 256 Wis. 440, 444, 41 N.W.2d 642 (1950).

Section 947.01, Stats., therefore, proscribes conduct in terms of results which can reasonably be expected therefrom rather than attempting to enumerate the limitless number of antisocial acts which a person could engage in that would menace, disrupt, or destroy public order. *State v. Werstein,* 60 Wis. 2d 668, 671–72, 211 N.W.2d 437 (1973). Such is especially true in regard to the "otherwise disorderly" proscription wherein the relatedness of the conduct and the circumstances is of ultimate importance. *Id.* at 672.

In *State v. Maker,* 48 Wis. 2d 612, 616, 180 N.W.2d 707 (1970), this court stated:

> This court's emphasis upon the relatedness of conduct and circumstances in the statute is no more than a recognition of the fact that what would constitute disorderly conduct in one set of circumstances, might not under some other. When a famed jurist observed, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic," the comment related to the crowdedness of the theater as well as to the loudness of the shout. It is the combination of conduct and circumstances that is crucial in applying the statute to a particular situation.

(Footnote omitted.)

A careful review of Wisconsin cases interpreting the "otherwise disorderly" provision will demonstrate the importance of a coalescing of conduct and circumstances.

> In *State v. Givens* (1965), 28 Wis. 2d 109, 135 N.W.2d 780, we affirmed a conviction for disorderly conduct of several demonstrators who conducted a "sit-in" in a small municipal office. We found that the "otherwise disorderly" conduct of the demonstrators may not in another situation be criminally proscribed, but because of the circumstances therein involved—the forcible entry into and congesting of a small office thereby making its continued functioning impossible—their conduct was in fact disorderly. Likewise in *State v. Zwicker,* [41 Wis. 2d 497, 164 N.W.2d 512 (1969)] we deemed the obstruction of the hallways and the use of signs under the circumstance therein involved to constitute disorderly conduct. Under varying circumstances, the display-

ing of a sign would not be deemed disorderly. Finally, in *State v. Elson,* [60 Wis. 2d 54, 208 N.W.2d 363 (1973)] we upheld the conviction of an attorney for too vigorously disputing the denial of his right to converse with his client because of the fact that such protestation occurred in the ward of a mental hospital.

In each of these cases, convictions for being "otherwise disorderly" resulted from the inappropriateness of specific conduct because of the circumstances involved.

*Werstein,* 60 Wis. 2d at 672–73.

██ Detective White's job was to prevent anyone except emergency personnel from proceeding into the crash area. He did not know whether there were any crash survivors, whether the crash was of a commercial or military jet, whether there was a continuing threat of fire or explosion, why the plane crashed or whether other members of the media were on the site. Those in authority over particular areas must be accorded discretion to regulate conduct therein. *Givens,* 28 Wis. 2d at 121. Such regulation, however, must be reasonably designed to preserve good order. The reasonableness of the order to restrict access to the crash site is obvious. The presence of nonemergency personnel would inhibit and perhaps prevent rescue of survivors, fire-fighting efforts, body removal, and evidence-gathering efforts. Furthermore, East College Avenue provided the only means of direct access to the crash site for emergency vehicles. The appellant's defiance of Detective White's reasonable order was done in the presence of other members of the public who were gathered along the fence south of East College Avenue. In a situation which has the potential for significant crowd control

problems, common sense dictates that if one person is allowed to openly defy the authority of an officer in charge, others may soon follow.

The mere refusal to obey a police command does not ordinarily, however, constitute disorderly conduct. *Werstein,* 60 Wis. 2d at 676. Mere presence absent any conduct which tends to cause or provoke a disturbance does not constitute disorderly conduct. *Id.* at 674. To hold without limitation that any violation of a police command, whether or not lawful, constitutes disorderly conduct would be patently violative of the fourteenth amendment. *See Gregory v. City of Chicago,* 394 U.S. 111 (1969). Therefore, in *Werstein,* this court determined that the mere presence of demonstrators at an army induction center, together with the demonstrators' refusal to obey an officer's command, did not constitute conduct that was otherwise disorderly. *Werstein,* 60 Wis. 2d at 676–77. The dissent maintains that the facts in *Werstein* are analogous to the facts in this case. Dissenting opinion at 557. We fail to see the similarity between the refusal to obey an officer's command at a peaceful demonstration at an army induction center and the actions of the appellant at the scene of this disaster.

Consequently, we determine that under the circumstances of this case, the appellant's repeated refusal to obey Detective White's reasonable order in a situation in which crowd control was a major concern, *combined with* his continued penetration into a nonpublic restricted area in the presence of the general public, was "otherwise disorderly" conduct because the appellant's conduct was similar to the conduct enumerated in sec. 9:947:01, in having the tendency to disrupt

544

good order. As such, we find that the first element of disorderly conduct under sec. 9:947:01 is met in this situation.

In regard to the second element of disorderly conduct in Wisconsin, we find that the conduct engaged in by the appellant, under the circumstances as they then existed, did tend to cause or provoke a disturbance. It is not necessary that an actual disturbance must have resulted from the appellant's conduct. The law only requires that the conduct be of a type which tends to cause or provoke a disturbance, under the circumstances as they then existed. *See* comment to proposed sec. 347.01, Stats. (1955),[3] in Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code,* vol. V at 208 (1953). We conclude that the appellant's repeated refusal to obey Detective White's reasonable order, combined with his continued penetration into a nonpublic restricted area in the presence of the general public, was conduct of a type which tends to cause or provoke a disturbance, under the circumstances as they then existed. Therefore, we affirm the decision of the circuit court finding the appellant guilty of disorderly conduct in violation of City of Oak Creek Municipal Ordinance Sec. 9:947:01 because we find that the appellant's conduct was disruptive of good order and tended to cause or provoke a disturbance, and we are satisfied from the record that guilt has been assessed on substantial grounds and not upon hypercritical or supersensitive grounds. *See Givens,* 28 Wis. 2d at 122.

[3]Section 347.01, Stats. (1955), as created by ch. 623, Wis. laws of 1953, was the predecessor of the current disorderly conduct statute.

## WHETHER, AS APPLIED, SEC. 947.01, STATS., AS ADOPTED BY CITY OF OAK CREEK MUNICIPAL ORDINANCE SEC. 9:947:01, IS VOID FOR VAGUENESS

The concept of vagueness or indefiniteness rests on the constitutional principle that procedural due process requires fair notice and proper standards for adjudication. The primary issues involved are whether the provisions of a penal statute are sufficiently definite to give reasonable notice of the prohibited conduct to those who wish to avoid its penalties and to apprise judge and jury of standards for the determination of guilt. If the statute is so obscure that people of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional. *State v. McCoy,* 143 Wis. 2d 274, 285–86, 421 N.W.2d 107 (1988); *Bachowski v. Salamone,* 139 Wis. 2d 397, 406, 407 N.W.2d 533 (1987).

Section 947.01, Stats., has previously been challenged for vagueness. In *Givens,* this court held that the fact that a statute fails to itemize with particularity every possible kind of conduct which would violate such statute does not make it unconstitutionally vague. *Givens,* 28 Wis. 2d at 117. In addition, we held that the disorderly conduct statute is reasonably explicit.

> [T]he six types of affirmative conduct which are expressly listed in the statute all tend to disrupt good order and to provoke a disturbance. When the statute, after the specific enumerations, in a "catch-all" clause proscribes "otherwise disorderly conduct" which tends to "provoke a disturbance," this must mean conduct of a type not previously enu-

merated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance. Such interpretation rests upon the rule of *ejusdem generis*. ... Upon this approach, the instant statute sufficiently identifies the type of behavior which the legislature intended to be contrary to law.

*Id.* at 115 (citations omitted).

Similarly, in *Zwicker,* we determined that sec. 947.01(1), Stats. (1967), sufficiently identified the type of behavior which the legislature intended to be contrary to law and that the statute was not subject to an attack for vagueness. *Zwicker,* 41 Wis. 2d at 507–08.

> Wisconsin's disorderly conduct statute proscribes conduct in terms of results which can reasonably be expected therefrom, rather than attempting to enumerate the limitless number of antisocial acts which a person could engage in that would menace, disrupt or destroy public order. The statute does not imply that all conduct which tends to annoy another is disorderly conduct. Only such conduct as unreasonably offends the sense of decency or propriety of the community is included. The statute does not punish a person for conduct which might possibly offend some hypercritical individual. The design of the disorderly conduct statute is to proscribe substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly abusive or disturbing demeanor in the eyes of reasonable persons.

*Id.* at 508.

Finally, in affirming the judgment of the United States District Court for the Western District of Wisconsin in *Zwicker v. Boll,* 391 U.S. 353 (1968), we are of the opinion that the United States Supreme Court made a determination that the Wisconsin disor-

derly conduct statute is not vague. *See State v. Zwicker,* 41 Wis. 2d at 508.

The appellant asserts that sec. 947.01, Stats., as applied in this instance, failed to give the appellant notice that his conduct was prohibited. This argument is without merit. The appellant certainly seemed to know that arrest for his conduct was possible, since he was the first to mention it. More importantly, however, is that persons of common intelligence would realize that repeated refusals to obey a police officer's reasonable order in a situation in which crowd control was a major concern, combined with continued penetration into a nonpublic restricted area in the presence of the general public, is conduct which, although not violent, abusive, indecent, profane, boisterous or unreasonably loud, is similar thereto in having a tendency to disrupt good order and to provoke a disturbance. Therefore, we conclude that sec. 947.01, Stats., is not constitutionally void for vagueness as applied.

## WHETHER THE APPELLANT AS A NEWS GATHERER HAD A RIGHT OF ACCESS TO THE SCENE OF THIS AIRPLANE CRASH BEYOND THE GENERAL PUBLIC'S RIGHT TO ACCESS

The appellant advances two principal arguments why news gatherers as surrogates for the general public should have a right of access to emergency sites. First, the appellant argues that the first amendment to the United States Constitution protects the right to gather information. Second, the appellant argues that art. I, sec. 3 of the Wisconsin Constitution protects the right of the press to gather information.

We will first address the appellant's first amendment argument. It has generally been held that the first amendment does not guarantee the press a constitutional right of special access to information not available to the public generally. *Branzburg v. Hayes,* 408 U.S. 665, 684 (1972), citing *New York Times Co. v. United States,* 403 U.S. 713, 728–30 (1971) (Stewart, J., concurring); *Zemel v. Rusk,* 381 U.S. 1, 16–17 (1965).

The right to speak and publish does not carry with it the unrestrained right to gather information. *Zemel,* 381 U.S. at 17. Therefore, in *Zemel,* the United States Supreme Court sustained the government's refusal to validate passports to Cuba even though that restriction rendered less than wholly free the flow of information concerning that country. *Id.* at 16. The Court noted:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.

*Id.* at 16–17.

Similarly, in *Branzburg,* the United States Supreme Court stated that "[n]ewsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded ...." *Branzburg,* 408 U.S. at 684–85. "Despite the fact that news gathering may be hampered, the press is regularly excluded from grand jury proceedings, our own confer-

ences, the meetings of other official bodies gathered in executive session, and the meetings of private organizations." *Id.* at 684.

The United States Supreme Court continued its discussion of this issue in *Pell v. Procunier,* 417 U.S. 817 (1974). In *Pell,* the Court upheld a state regulation which prohibited press interviews with specific prisoners. The Court held that "[n]ewsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.* at 834. The Court noted the first and fourteenth amendments bar government from interfering in any way with a free press. The Constitution does not, however, require the government to accord the press special access to information not shared by members of the public generally. *Id.*

Finally, in *Houchins v. KQED, Inc.,* 438 U.S. 1, 11 (1978), an opinion joined by three justices stated that there is an undoubted right to gather news from any source by means within the law, but that affords no basis for the claim that there is a first amendment right of special access to information not available to the public generally. *See also Branzburg,* 408 U.S. at 681–82. The *Houchins* opinion noted, "The fact that the Court relied upon *Zemel v. Rusk,* 381 U.S. 1 (1965), in both *Branzburg,* 408 U.S., at 684 n. 22, and *Pell,* [417 U.S.] at 834 n. 9, further negates any notion that the First Amendment confers a right of access to news sources." *Houchins,* 438 U.S. at 11.

The appellant contends that *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980), has overruled *sub silentio* the *Branzburg* ruling that the media has no constitutional right of access to the scenes of crimes and disasters when the general public is excluded. We disagree. In *Richmond Newspapers,* then-Chief Justice Burger wrote that absent an overriding interest, the

first amendment requires that a criminal trial must be open to the public. *Id.* at 581. The Court was addressing in *Richmond Newspapers* the right of *the public and the press* to attend courtrooms which have long been open to the public. In the case before this court, however, the appellant is seeking to obtain special access to the scene of an airplane crash beyond the public's right to access simply because he is a "news gatherer" as opposed to an "ordinary citizen." Consequently, we hold that the *Richmond Newspapers* decision is inapplicable to the situation before this court and that the *Branzburg* ruling has not been overruled *sub silentio.*

The dissent concedes that the United States Supreme Court has not recognized a constitutional protection for news gatherers' access to an accident scene, yet the dissent notes that in certain circumstances the Court has recognized that particular institutions have allowed the press greater access than the public to serve as a surrogate for the public. Dissenting opinion at 559–560. It is interesting to note the particular facts of the two cases the dissent cites as support for its proposition. In *Richmond Newspapers,* as described above, the Court dealt with the issue of the right of access to courtrooms. In *Saxbe v. Washington Post Co.,* 417 U.S. 843, 847 (1974), the Court was dealing with the right of access to prisons. The dissent fails to note that there is a difference between an institution allowing news gatherers priority of access on its own accord, in a setting in which the institution may closely control and monitor access, and this court mandating access in an emergency situation. Even the appellant concedes that "[a] right of access to trials does not necessarily imply a right of access to emergency scenes."

551

Our interpretation of the preceding United States Supreme Court cases leads us to the conclusion that under the first amendment, the appellant has an undoubted right to gather news from any source by means within the law.[4] However, the appellant does not have a first amendment right of access, solely because he is a news gatherer, to the scene of this airplane crash when the general public has been reasonably excluded.[5]

The appellant's second argument is that art. I, sec. 3 of the Wisconsin Constitution provides a basis for a news gatherer's right of access to the scene of an airplane crash beyond the general public's right of access. The appellant, however, has failed to offer any precedent which would support his contention. In addition, on the basis of the record before us, we are not inclined to recognize such a right because news gatherers were not denied access to the crash site of Midwest Express Flight 105 on September 6, 1985.

---

[4]The dissenting justices obviously misread this court's decision when they opine that "the majority opinion concludes that the federal constitution does not protect the media's right to gather information." Dissenting opinion at page 558. As we have just indicated, "under the first amendment, the appellant has an undoubted right to gather news from any source by means *within* the law" (emphasis added). *See Houchins,* 438 U.S. at 11, citing *Branzburg,* 408 U.S. at 681–82.

[5]*Cf. State ex rel. La Crosse Tribune v. Circuit Court for La Crosse County,* 115 Wis. 2d 220, 237, 340 N.W.2d 460 (1983), where this court in addressing sec. 757.14, Stats., which presumptively mandates that every sitting of a court shall be public, noted that "the standing of the media is not a special one but is identical to that of the public. The right secured statutorily by sec. 757.14, Stats., is one secured to the public and to the press as a part of the public."

While the appellant was disregarding Detective White's orders and penetrating into the nonpublic restricted area of the airport, other news gatherers were assembling in the airport director's office at the airport, pursuant to the General Mitchell Field Media Guide. At 4:30 p.m., the airport director held a briefing which lasted approximately 15 minutes. Immediately thereafter, the director took media representatives directly to the crash site to take photographs or film the scene. Therefore, given the fact that news gatherers were given access to the scene of this airplane crash, we are not inclined to rule on the issue of whether a news gatherer has a right of access to the scene of an airplane crash under the Wisconsin Constitution beyond that of the general public's right of access.

Furthermore, the needs and rights of the injured and dying should be recognized by this court as having preference over newly created "rights" that the dissenting justices would give to a "news gatherer" who is simply concentrating on trying to beat out his competition and make his employer's deadline. As the circuit court so aptly noted in its memorandum decision, in an emergency situation "[t]he injured and dying are entitled to receive the immediate and full attention of rescue workers. Law enforcement personnel should not be required to needlessly occupy themselves with persons who have a personal interest not related to restoration of order or with rescue attempts. The defendant, here, chose to disregard the government's efforts to establish order, set himself and his interest above the law, diluted law enforcement efforts to assist those in need, and by so doing elevated his own interest and concerns above the welfare of the persons involved in the tragic accident and the government's efforts in its law enforcement concerns."

In conclusion, we affirm the decision of the circuit court finding the appellant guilty of disorderly conduct in violation of City of Oak Creek Municipal Ordinance Sec. 9:947:01. In addition, we hold that sec. 9:947:01 as applied in this case is not unconstitutionally vague. Finally, we hold that the appellant as a news gatherer had no first amendment right of access to the scene of this airplane crash, under the circumstances described above, beyond the general public's right to access.

*By the Court.*—The decision of the circuit court is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The state has a significant interest in keeping people away from the site of an accident or crime to expedite assisting victims, to preserve evidence or to protect the public from injury. This state interest, however, is not at issue in this case. The record shows that the defendant was not interfering with or obstructing emergency personnel and that neither he nor other observers were in danger.

The issue in this case is whether the defendant's refusing to obey an officer's command to leave the accident scene constitutes the offense of disorderly conduct as defined in the Oak Creek ordinance. I conclude it does not. Moreover, I conclude that this court should acknowledge that a representative of the news media may function as a proxy for the public in certain situations where public access is limited.

### I.

The question before the court is whether this defendant's refusal to obey an officer's command to leave the scene of an accident violates the Oak Creek disorderly conduct ordinance under which the defendant was charged. The court does not determine in this case whether the defendant's conduct is wise, is in the public interest, or violates some other law.

The majority opinion concedes that the defendant's conduct does not fall within the types of disorderly conduct specified in the ordinance. The majority opinion recognizes that the defendant's conduct was not violent, abusive, indecent, profane, boisterous or unreasonably loud. Thus to be a violation of the ordinance, the defendant's conduct must fall within the ordinance's catchall language, that is, the city must

prove that the defendant's conduct is "otherwise disorderly."

The defendant in this case refused to obey an officer's command to leave. This court has said that mere refusal to obey an officer's command does not ordinarily constitute "otherwise disorderly" conduct.

In *State v. Werstein,* 60 Wis. 2d 668, 211 N.W.2d 437 (1973), the court found that the mere presence of demonstrators at an induction center, together with the demonstrators' refusal to obey an officer's command, did not constitute "otherwise disorderly" conduct. The court specifically noted that the state had not adequately proven that fears of future disruption were reasonable. The court also took note that the police did not exclude other unauthorized visitors. *Id.* at 676. These two circumstances distinguished the *Werstein* case from previous cases in which the court had found protesters' behavior to be disorderly.

The facts in this case are analogous to those in *Werstein.* In both cases there was no evidence that the defendant was disruptive. The majority opinion suggests that the defendant's presence in this case could have interfered with rescue and fire-fighting efforts or that the defendant himself might have been in danger in the event of fire or explosion. Such eventualities are speculative and therefore cannot, under the law as set forth in *Werstein,* constitute grounds for finding the defendant's conduct to be disorderly conduct.

Furthermore, in this case as in *Werstein,* it is significant that, according to the record, "like action" was not taken against others. The defendant here produced evidence that a number of other news gatherers took pictures and otherwise surveyed the crash site from various points inside the police boundary without being disturbed or challenged by the police.

I conclude that the majority opinion's interpretation of the Oak Creek disorderly conduct ordinance cannot be reconciled with this court's earlier decisions interpreting the disorderly conduct statute upon which the ordinance is based. I conclude that the facts of this case do not support a finding that the defendant committed "substantial intrusions which offend the normal sensibilities of average persons or which constitute significantly abusive or disturbing demeanor in the eyes of reasonable persons." *Werstein, supra,* 60 Wis. 2d at 674, quoting *State v. Zwicker,* 41 Wis. 2d 497, 508, 164 N.W.2d 512, dismissed 396 U.S. 26 (1969).

## II.

The second issue the defendant raises is whether the defendant's conduct in gathering information is protected by the federal and state constitutions.

According to the majority opinion, the airport officials provided the news gatherers with access to the scene of the crash: The airport director briefed news gatherers at 4:30 p.m. and then took them to the scene of the crash. Majority at 553. The logical conclusion from the majority's view of the facts would appear to be that airport personnel did not interfere with the defendant's news gathering activity and that therefore no constitutional issue is presented.

Nevertheless the majority opinion concludes that the federal constitution does not protect the media's right to gather information. The majority opinion then declines to discuss the question of whether the state constitution protects the media's right to gather information on the ground that news gatherers were given access to the crash site in this case.

558

I am at a loss to understand why the majority opinion discusses (apparently in dicta) the federal constitution, in light of the majority opinion's factual conclusion that there was no interference with the defendant's news gathering activity and in light of its refusal to discuss the state constitutional question.

The majority opinion does not, in my opinion, adequately address the defendant's argument regarding the rights of news gatherers to access to an accident scene.

The defendant does not argue that the government must always allow news gatherers access to an accident scene. Rather the defendant asks this court to hold that governmental personnel must give news gatherers access to a position at an accident from which they can observe emergency personnel in action unless exclusion of news gatherers from all locations is required to enable emergency personnel to perform their tasks. The defendant argues that this standard accommodates two important objectives: It enables the media to inform the public about the accident and governmental operations while it prevents news gatherers from jeopardizing people's lives, health or property.

While the United States Supreme Court has not explicitly recognized a constitutional protection for news gatherers' access to an accident scene, the Court has recognized that media representatives serve as surrogates for the public. Chief Justice Warren Burger, writing in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980), about the right of the public and the press to attend criminal trials observed:

> Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly

through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public.

Chief Justice Burger recognized in the *Richmond Newspapers* case that government authorities have allowed priority access to news gatherers in situations where public access is limited by circumstance. The Chief Justice wrote: "While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard." *Richmond Newspapers, supra,* 448 U.S. at 572–573.

In *Saxbe v. Washington Post Co.,* 417 U.S. 843, 847 (1974), Justice Potter Stewart, writing for the court, acknowledged that sometimes the press is given greater access to information than the public. The Justice observed that "members of the press are accorded substantial access to the federal prisons in order to observe and report the conditions they find there. Indeed, journalists are given access to the prisons and to prison inmates that in significant respects exceeds that afforded to members of the general public."

This court has itself institutionalized procedures for accommodating media personnel—procedures which do not provide similar rights to private individuals. Chapter 61 of the Supreme Court Rules, entitled Rules Governing Electronic Media and Still Photography Coverage of Judicial Proceedings, concludes with the caveat, "The privileges granted by this chapter to photograph, televise and record court proceedings may be exercised only by persons or organizations which are part of the news media." S.C.R. sec. 61.12.

I conclude that, in determining the scope of news gatherers' access to accidents, the court can and should

take into consideration the media's role as the "eyes and ears" of the public at large. *Cf., State ex rel. Newspapers v. Showers,* 135 Wis. 2d 77, 81, 398 N.W.2d 154 (1987). Time, place and manner restrictions on access to the site of an accident which are properly applicable to the general public may not be appropriate when applied to the media.

For the reasons set forth I do not join the majority opinion.

I am authorized to state that Chief Justice Nathan S. Heffernan and Justice William A. Bablitch join this dissent.