STATE of Wisconsin, Plaintiff-Respondent,

v.

Glenn F. SCHWEBKE, Defendant-Appellant.†

Court of Appeals

*No. 99–3204–CR.  Submitted on briefs November 14, 2000.—Decided February 21, 2001.*

## 2001 WI App 99

(Also reported in 627 N.W.2d 213.)

†Petition to review granted.

On behalf of the defendent-appellant, the cause was submitted on the briefs of *Keith A. Findley* of *Frank J. Remington Center, University of Wisconsin Law School,* Madison. There was oral argument by *Keith A. Findley.*

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Jeffrey J. Kassel,* assistant attorney general, and *James E. Doyle,* attorney general. There was oral argument by *Jeffrey J. Kassel.*

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Glenn F. Schwebke appeals from a judgment of conviction on six counts of disorderly conduct contrary to WIS. STAT. § 947.01

(1999–2000).[1] Schwebke contends that as a matter of law his conduct of mailing copies of newspaper clippings, letters and 45 RPM recordings to three individuals does not constitute disorderly conduct. Additionally, he argues that the circuit court erred in imposing consecutive terms of probation. We disagree with Schwebke's first contention, and affirm his disorderly conduct conviction. However, we agree with Schwebke's second argument regarding error in his sentencing and therefore reverse the imposition of consecutive terms of probation.

### Relevant Facts

¶ 2.   In 1996, Roberta Twohig, as well as Twohig's sister, Patty Marcinko, and Twohig's former boyfriend, Thomas Lamke, received anonymous mailings.[2] In May 1996, Twohig received two manila envelopes: one mailed to her home and one mailed to her workplace. The mailing address on both envelopes was stenciled, both envelopes bore thirtieth birthday greetings (Twohig's birthday is May 9th) and neither envelope bore a return address. Inside each of the envelopes was an unsigned stenciled letter. The letter sent to Twohig's home read:

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

[2] Schwebke was suspected of being the sender of these mailings because he had previously harassed Twohig and Lamke. The parties agreed not to place Schwebke's other acts of harassment into evidence. In order to provide context for the jury, the parties agreed to admit into evidence the fact that some of the victims had been previously harassed. However, they also agreed not to divulge that Schwebke was the source of that previous harassment.

THE HIGH SCHOOL YEARS
ROBBIE, NO DOUBT A VERY
FINE YOUNG LADY

YOU WOULD HAVE MADE A
LOVELY MISS TEEN
WISCONSIN AND FAIREST
OF THE FAIR
I'M SURE YOU WERE VERY
POPULAR WITH ALL THE
GUYS AND GIRLS IN HIGH
SCHOOL AND ARE WELL
LIKED BY ALL YOUR
STUDENTS AT BHS

I WILL ALWAYS LOVE
YOU, ROBBIE

Along with this stenciled letter, the envelope contained about thirty newspaper clippings relating to Twohig's activities during her high school years: articles about 4-H awards, prizes won at the county fair, scholarships awarded, appearances in local theater productions, participation in the Fond du Lac County "Fairest of the Fair" competition, and the like.

¶ 3. The letter sent to Twohig's workplace stated:

THE COLLEGE YEARS
ROBBIE WAS NO DOUBT A
VERY INTERESTING YOUNG WOMAN

I'M SURE YOU WERE VERY
POPULAR AT UW-FDL AND UW-O

YOU MUST HAVE HAD A LOT
OF FUN IN FLORIDA WITH
YOUR BUBBLY PERSONALITY

SPAIN MUST HAVE BEEN A REAL
LEARNING EXPERIENCE ALSO

YOUR NEIGHBORS MUST THINK
THAT YOUR [sic] A VERY NICE PERSON

I WILL ALWAYS LOVE
YOU ROBBIE

Included in this envelope were approximately twenty-one newspaper clippings relating to Twohig's activities as a college student.

¶ 4.   In response to receiving these two mailings, Twohig immediately contacted the police. In September 1996, Twohig received by mail another envelope at her workplace. The envelope had the same stenciled writing as the previous two mailings, with no return address. It was marked "[f]ragile, handle with care." Inside the envelope was a stenciled letter that said, "I want to share two of my favorite records with you[.] I love you Robbie[.]" The envelope also contained two 45 RPM records. One of the records was entitled "Roberta," Twohig's first name. The other record was entitled "Every Breath You Take." On both records the flip-side titles were blackened out, making it clear that Twohig was to give attention to the legible titles.

¶ 5.  Twohig was familiar with the lyrics of "Every Breath You Take," a popular song in the 1980s. The song contains the following lyrics:

> Every breath you take, Every move you make, Every bond you break, Every step you take, I'll be watching you, Every single day, Every word you say, Every game you play, Every night you stay, I'll be watching you. . . .

¶ 6.  In January 1997, four months after receiving the recordings, Twohig received an envelope at work. Like all of the previous mailings, the address was stenciled. This envelope contained two 45 RPM records and a stenciled note which read, "I will always love you Robbie." Again, each record had the flip-side titles blackened out; the legible titles were "I Wonder What She's Doing Tonight" and "Green-Eyed Lady."

¶ 7.  Finally, in February 1997, near Valentine's Day, Twohig received an envelope at her workplace. The envelope bore a stenciled address and a handwritten note reading "FRAGILE Open on Valentine's Day." Inside the envelope was a silk rose, a 45 RPM recording of the song "Hot For Teacher" and a blank piece of paper.

¶ 8.  At the jury trial in May 1999, Twohig testified that she felt "[c]ompletely violated. To have someone keep this meticulous track of what you did over half of your life ago, it's a feeling of violation that is almost indescribable." She said she was "extremely" upset and disturbed to receive the recording of "Every Breath You Take" because of "[t]he content of that song and 'You belong to me, I'll be watching you.' In my opinion whoever sent it was taking every step they could to make sure that I knew they still had an eye on me and still knew what I was doing."

¶ 9. Twohig testified that with each mailing she received, she became "more frightened, looking over my shoulder twice as many times, taking twice as many precautions. It was terrible to be in such fear day after day going to the mailbox . . . ." Twohig also explained how these mailings negatively affected many people:

> Not only my family, my friends, my coworkers. Everyone was taking as many precautions as they could watching out after me, making sure that everything I received was legitimate. It was terrible. The stress that went with this was incredible. Jumping every time you go to the mailbox and seeing a manilla envelope wondering what's going to be in it. My parents were distraught. My sister and her family were absolutely besides [sic] themselves.

¶ 10. Twohig also testified that prior to the mailings at issue, she had been exposed to harassing conduct in the past and that it had gone on for many years. As a result of these circumstances, she had already made changes to her life-style. She had consulted web sites and experts on harassment for advice. She had moved several times within a few years. She had gotten caller ID. She had changed her phone number to an unlisted number. She had informed her family, friends and coworkers not to give out any information about her.

¶ 11. Twohig's former boyfriend, Thomas Lamke, an investigator with the Racine County Sheriff's Department, also received anonymous mailings. In July 1996, Lamke received unsolicited gay cruise literature at his home and workplace. Three months later, in October 1996, again at his workplace, Lamke received a manila envelope with a stenciled address

and no return address. The envelope contained a blank piece of paper and two 45 RPM records. One flip-side title of each record was blackened out. The legible titles were "Where The Boys Are" and "San Francisco (Be Sure To Wear Some Flowers In Your Hair)." The mailing disturbed Lamke because, given the previous anonymous mailing, he inferred that the contents of this mailing were intended as a reference to homosexuality. Lamke reported these mailings to the police.

¶ 12.   Lamke also testified that in the past, before either of the above mentioned mailings, unsolicited anonymous gay literature "showed up" at his home and workplace "against [his] will." At that time, he was subjected to "pretty substantial ridicule" from other members of the sheriff's department. And now again, mailings were causing him "problems at work." As a result, he said that he "had a much greater heightened sense of awareness as far as going about . . . everyday business not knowing who was out there and what's next."

¶ 13.   Twohig's sister, Patty Marcinko, a teacher, also received anonymous mailings. On February 22, 1997, Marcinko received two manila envelopes, one sent to her home and one sent to the junior high school where she worked. Each envelope bore a stenciled address and a thirty-fourth birthday greeting; neither had a return address. The envelope sent to Marcinko's home contained a stenciled letter that read "UW-Oshkosh Days and Beyond. . . . . . .. . . .You would have made a good Miss Fond Du Lac/Reverend Anthony Scannell did an excellant [sic] job presiding over your wedding ceremony in 1994." Along with the letter, the envelope contained approximately twenty-five newspaper clippings relating to Marcinko, including articles about her wedding, family events, academic achieve-

ments and her participation in local theater productions.

¶ 14. The envelope sent to Marcinko's workplace contained a stenciled letter which read: "Campbellsport H.S. and UW-FDL Days/What do. . . ../Burger King, Hardees, The Exclusive Company & UW-O Academic Staff/. . . ..All have in common?" Marcinko had worked at Burger King, the Exclusive Company and UW-Oshkosh. The envelope also contained approximately thirty-seven newspaper clippings relating to Marcinko's life as a high school student and college student. Marcinko felt threatened by the mailings and contacted the police. Her husband was very concerned because the harassment had now targeted his wife. Marcinko's parents, already worried about their daughter Robbie, found it "overwhelming" to have the harassment be aimed at their daughter Patty as well.

¶ 15. Twohig testified that she was equally disturbed by the mailings sent to Lamke and Marcinko:

> Well, not only was I becoming a victim, but it was spreading out. It was rippling. It was almost like a ripple effect. People that I had had relationships with, that I loved, were all getting the same things that I was receiving. And their lives were being intruded upon to such a degree, to such an incredible degree.

### Relevant Procedural History

¶ 16. On November 18, 1998, the State filed an amended criminal complaint charging Schwebke with six counts of disorderly conduct: four arising from his mailings to Twohig, one arising from a mailing to

Lamke, and one arising from a mailing to Marcinko.[3] Before trial, Schwebke signed a stipulation acknowledging that he had compiled and mailed each of the mailings referred to in the complaint.

¶ 17. At the close of the State's case, Schwebke moved for dismissal, arguing that the State's evidence was insufficient to prove disorderly conduct. The court denied the motion, finding sufficient evidence for a jury to find Schwebke guilty beyond a reasonable doubt of the charges of disorderly conduct. The jury convicted Schwebke on all six counts. The court imposed consecutive ninety-day jail sentences on each of the counts, but stayed the execution of sentence on counts four, five and six. On counts four, five and six, the court imposed and stayed ninety days' jail and ordered probation of four years consecutive to the jail sentences on the first three counts and consecutive to each of the other probationary terms.

### Law

¶ 18. Wisconsin's disorderly conduct statute provides:

> Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.

WIS. STAT. § 947.01.

---

[3] Schwebke argues that he was improperly charged. It is immaterial that the district attorney could have charged Schwebke under a different statute. The district attorney has almost unfettered discretion in selecting charges. *State v. Krueger*, 224 Wis. 2d 59, 67–68, 588 N.W.2d 921 (Ct. App. 1998).

## Standard of Review for Sufficiency of the Evidence

¶ 19.   The standard for reviewing the sufficiency of the evidence to support a criminal conviction is that a conviction will not be reversed unless the evidence, viewed most favorably to the State and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger*, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1989).

## Analysis: Sufficiency of the Evidence

¶ 20.   The evidence sufficiently supports the jury's finding that Schwebke violated Wisconsin's disorderly conduct statute. There are two elements to disorderly conduct: (1) the conduct must be of the type enumerated in the statute or *similar thereto* (i.e., "otherwise disorderly conduct") and (2) such conduct must be engaged in under circumstances which tend to cause or provoke a disturbance. *State v. Zwicker*, 41 Wis. 2d 497, 515, 164 N.W.2d 512 (1969); WIS JI—CRIMINAL 1900.

¶ 21.   With regard to the first element, the State argues that Schwebke's mailings constituted "otherwise disorderly conduct." We agree with the State that a jury could reasonably find that Schwebke's conduct of sending these types of repeated, unwelcome and anonymous mailings rises to the level of "otherwise disorderly conduct." These mailings intimated that the sender had an obsessive interest in the lives of the

three recipients. In the case of Twohig and Marcinko, the numerous newspaper clippings—covering their lives—indicated that the sender had been watching them for years. In Twohig's case, the four letters mailed to her referred to such things as her name, the color of her eyes and her occupation, and did so in a way that indicated that the sender was "hot for" her and was watching "every move" she made. In determining whether an act is disorderly conduct, we must look to see whether an average person would be reasonably offended. *Zwicker*, 41 Wis. 2d at 508. Twohig's testimony that she was "extremely" offended is more than reasonable; it is the expected reaction of someone in her situation.

¶ 22.  With regard to the second element, we again agree with the State that Schwebke's mailings were sent under circumstances that tended to cause or provoke a disturbance. To meet the test for this element, it is not necessary that an actual disturbance result from the conduct in question. *City of Oak Creek v. King*, 148 Wis. 2d 532, 545, 436 N.W.2d 285 (1989). However, the best evidence that Schwebke engaged in disorderly conduct is that his conduct did cause a disturbance. *See State v. Elson*, 60 Wis. 2d 54, 60–62, 208 N.W.2d 363 (1973) (court relied on evidence that the defendant's conduct caused agitated and disturbed reactions in onlookers to support the jury's finding that the conduct tended to cause or provoke a disturbance). WISCONSIN STAT. § 947.01 proscribes conduct in terms of results which can reasonably be expected therefrom, rather than attempting to enumerate the limitless number of antisocial acts which a person could engage in that would menace, disrupt or destroy public order. *Zwicker*, 41 Wis. 2d at 508. The predictable and the

actual result of Schwebke's antisocial conduct was to menace and disrupt the lives of Twohig, her friends and family. Schwebke's conduct was *significantly disturbing*, permeating the lives of not only the recipients of his mailings but those who were close to the recipients. *See id.* (noting that the design of Wisconsin's disorderly conduct statute is to proscribe substantial intrusions which offend the normal sensibilities of average persons or which constitute *significantly disturbing* or abusive demeanor in the eyes of reasonable persons). Marcinko's husband became very concerned when Schwebke's harassment extended from his sister-in-law to his wife. Twohig and Marcinko's parents were "distraught" and the harassment was "overwhelming" to them. Lamke was "very worried" about Twohig and became "fearful for her safety" when he learned that she was receiving these mailings. Twohig summed it up:

> Not only my family, my friends, my coworkers. Everyone was taking as many precautions as they could watching out after me, making sure that everything I received was legitimate. It was terrible. The stress that went with this was incredible. Jumping every time you go to the mailbox and seeing a manilla envelope wondering what's going to be in it. My parents were distraught. My sister and her family were absolutely besides [sic] themselves.

¶ 23.   It is the combination of conduct and circumstances that is crucial in applying the statute to a particular situation. *State v. Maker*, 48 Wis. 2d 612, 616, 180 N.W.2d 707 (1970). What constitutes disorderly conduct in one set of circumstances might not under another. *Id.*; *King*, 148 Wis. 2d at 542. In some

other circumstances, mailing anonymous letters and newspaper clippings might not constitute disorderly conduct. However, we do not consider Schwebke's mailings in a vacuum. Instead, we consider his mailings in the context of the harassment previously endured by Twohig and Lamke. In addition, we note that Marcinko and Lamke, along with other friends and family, were aware of these more current mailings and of the previous harassment that Twohig had experienced. Twohig, in turn, knew that both her sister and her friend had now become targets of harassment and she testified that this greatly disturbed her. The mailings sent a clear message that someone was following the recipients' every move. That message not only "tended to cause a disturbance," it did in fact deeply disturb the lives of Schwebke's victims and those close to the victims. Again, it was reasonable for a jury to find that Schwebke's mailings were sent under circumstances that tended to cause or provoke a disturbance.

**Standard of Review for Sentence Imposition**

¶ 24.    A court's authority in sentencing, including the power to impose consecutive sentences, is controlled by statute. *Donaldson v. State*, 93 Wis. 2d 306, 310, 286 N.W.2d 817 (1980). The determination of a court's statutory authority to impose a consecutive sentence is a question of law that we decide without deference to the trial court. *State v. Lipke*, 186 Wis. 2d 358, 363, 521 N.W.2d 444 (Ct. App. 1994).

**Analysis: Imposition of Consecutive Terms of Probation**

¶ 25.    We agree with Schwebke's argument that the trial court erred at sentencing and therefore

reverse the imposition of consecutive terms of probation. "The fashioning of a criminal disposition is not an exercise of broad, inherent court powers. . . . If the authority to fashion a particular criminal disposition exists, it must derive from the statutes." *Grobarchik v. State*, 102 Wis. 2d 461, 467, 307 N.W.2d 170 (1981). The permissible terms of probation are set forth in WIS. STAT. §§ 973.09 and 973.15(2).

¶ 26. The court's sentencing authority in WIS. STAT. § 973.09(2) provides in pertinent part:

The original term of probation shall be:

(a) 1. Except as provided in subd. 2., for misdemeanors, not less than 6 months nor more than 2 years.

2. If the probationer is convicted of not less than 2 nor more than 4 misdemeanors at the same time, the maximum original term of probation may be increased by one year. If the probationer is convicted of 5 or more misdemeanors at the same time, the maximum original term of probation may be increased by 2 years.

¶ 27. Therefore, because Schwebke was convicted of six misdemeanors at the same time, the total allowable term of probation is four years. The statute accommodates the multiple counts of conviction by allowing a single, extended term of probation (four years instead of two years). Under the rules of statutory construction, we must give effect to the legislative intent. *Zimmerman v. DHSS*, 169 Wis. 2d 498, 504, 485 N.W.2d 290 (Ct. App. 1992). The statute does not authorize consecutive terms of probation. Because the multiple counts are already reflected in the extended

maximum allowable probation term, it defies legislative intent to allow consecutive terms of probation.

¶ 28. WISCONSIN STAT. § 973.15(2) provides the statutory authority for making sentences consecutive to one another. Section 973.15(2)(a) reads:

> Except as provided in par. (b), the court may impose as many sentences as there are convictions and may provide that any such sentence be concurrent with or consecutive to any other sentence imposed at the same time or previously.

This statute does not authorize courts to make a term of probation consecutive to another term of probation.

¶ 29. WISCONSIN STAT. § 973.09(1) provides that a "period of probation may be made consecutive to a sentence on a different charge, whether imposed at the same time or previously." Again, this statute does not provide that a period of probation may be made consecutive to another term of probation. It is well established that a probationary term is not a sentence within the meaning of § 973.09(1). *Prue v. State*, 63 Wis. 2d 109, 114, 216 N.W.2d 43 (1974); *State v. Pierce*, 117 Wis. 2d 83, 85, 342 N.W.2d 776 (Ct. App. 1983). Probation is not a sentence, but an alternative to a sentence, *see State v. Gereaux*, 114 Wis. 2d 110, 113, 338 N.W.2d 118 (Ct. App. 1983), and we have repeatedly held that probation cannot be made consecutive to probation. *Pierce*, 117 Wis. 2d at 85; *Gereaux*, 114 Wis. 2d at 113.

¶ 30. Thus, the trial court's reliance on *State v. Thompson*, 208 Wis. 2d 253, 559 N.W.2d 917 (Ct. App. 1997), for imposing consecutive terms of probation was misplaced. In *Thompson*, the trial court sentenced the defendant to two prison terms, and ordered that those

terms be consecutive to each other and to any previously imposed sentence. *Id.* at 255. At the time of sentencing, the defendant had been placed in the intensive sanctions program as an alternative to his probation revocation in another case. *Id.* The trial court had imposed and stayed a four-year prison sentence, placing the defendant on probation for the previous conviction. *Id.* About two months after the sentencing in this case, the defendant's probation from the earlier case was revoked. *Id. Thompson* does not change the law against imposing consecutive terms of probation. *Thompson* allows the trial court to impose a sentence consecutive to a previously imposed and stayed *sentence* even if the defendant is placed on probation. *Id.* at 256. *Thompson* is distinguishable because in Schwebke's case the trial court did not order the probationary terms consecutive to a prior sentence, as did the trial court in *Thompson*; rather, it ordered the probationary terms consecutive to other terms of probation. *Id.* This was error on the trial court's part. *Id.*

■

¶ 31. WISCONSIN STAT. § 973.13 provides that where a penalty is imposed in excess of that permitted by law, the excess portion of the sentence is void and the sentence is commuted without further proceedings. *State v. Theriault*, 187 Wis. 2d 125, 133, 522 N.W.2d 254 (Ct. App. 1994). Therefore, we commute Schwebke's sentence to the total allowable term of probation. Schwebke was convicted of six misdemeanors at the same time; the total allowable term of probation is four years. WIS. STAT. § 973.09(2). We reverse the imposition of consecutive probation terms and direct the trial court to enter an amended judgment of conviction accordingly.

*By the Court.*—Judgment affirmed; order reversed and cause remanded with directions.