STATE of Wisconsin, Plaintiff-Respondent,

v.

Glenn F. SCHWEBKE, Defendant-Appellant-Petitioner.

Supreme Court

*No. 99–3204–CR. Oral argument November 8, 2001.—Decided May 29, 2002.*

2002 WI 55

(Also reported in 644 N.W.2d 666.)

1

4

For the defendant-appellant-petitioner there were briefs by *Keith A. Findley* and the *Frank J. Remington Center,* Madison, and oral argument by *Keith A. Findley.*

For the plaintiff-respondent the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the brief was *James E. Doyle,* attorney general.

¶ 1. WILLIAM A. BABLITCH, J. Petitioner Glenn Schwebke (Schwebke) was convicted by a jury on six counts of disorderly conduct for sending anonymous mail on six different occasions to three different individuals. The court of appeals affirmed these convictions. Schwebke now seeks a reversal of that decision based on the assertion that, as a matter of law, the disorderly conduct statute cannot apply to his conduct. He argues that the statute was not intended to apply and should not apply to such private mailings because they are harassing in nature and cause the recipients mere personal discomfort. We disagree. The disorderly conduct statute may apply to the mailings at issue in this case. Further, the evidence was sufficient to convict the defendant on all six counts. Accordingly, we affirm the court of appeals' decision.

I

¶ 2. Schwebke was initially charged with 14 counts of disorderly conduct in Fond du Lac County Circuit Court arising from mailings and telephone calls directed at four individuals. The mailings were sent

5

anonymously by Schwebke and contained items such as newspaper clippings, records, and stenciled letters. Schwebke moved to dismiss the complaint, alleging in part that, as to all counts, the complaint failed to allege facts sufficient to establish that Schwebke committed the crimes alleged. In this respect, Schwebke contended that sending "non-threatening, non-abusive and non-disturbing" news clippings, letters, and records through the mail did not constitute disorderly conduct because it was not the type of substantial intrusion that the disorderly conduct statute was intended to proscribe. He argued that the receipt of such materials by a person of average sensibilities would not tend to cause a disturbance.

¶ 3. The circuit court, the Honorable Dale L. English presiding, issued an order granting Schwebke's motion to dismiss in part and denying it in part. It dismissed one of the counts because it was charged in violation of the statute of limitations and dismissed five other counts because the criminal complaint did not establish that Schwebke committed the behavior alleged in the counts. With respect to the remaining allegations, the court held that the complaint contained sufficient information to support probable cause and that venue was properly established in Fond du Lac County.

¶ 4. Schwebke filed a petition for leave to appeal this order. The court of appeals denied the petition, concluding that a grant of leave to appeal would not materially advance the termination of the litigation and was not necessary to protect Schwebke from substantial or irreparable harm. The court of appeals also held that Schwebke's case did not present any novel issues of general importance to the administration of justice. Two other counts were later severed by the circuit

6

court. These counts related to a victim separate from the three victims involved in the remaining counts.

¶ 5. The amended complaint charged Schwebke with six counts of disorderly conduct for mailing envelopes with "disturbing contents" on six different occasions to three different people.[1] Four counts related to

---

[1] The November 18, 1998 third amended complaint against Schwebke alleged the following counts:

*COUNT #1:* [The defendant did] engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Thomas Lamke;

*COUNT #2:* FURTHER, the defendant did on or about 5–7-96 in the City and County of Fond du Lac, engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Robbie Twohig;

*COUNT #3:* FURTHER, the defendant did on or about 9–27-96 in the City and County of Fond du Lac, engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Robbie Twohig;

*COUNT #4:* FURTHER, the defendant did on or about 27th of January 1997 in the City and County of Fond du Lac, engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Robbie Twohig;

*COUNT #5:* FURTHER, the defendant did on or about 2–12-97 in the City and County of Fond du Lac, engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Robbie Twohig;

*COUNT #6:* FURTHER, the defendant did on or about 2–19-97 in the City and County of Fond du Lac, engage in otherwise disorderly conduct under circumstances in which the conduct tends to cause a disturbance, to-wit: did mail an envelope with disturbing contents to Patti Marcinko;

. . . .

7

mailings sent to Robbie Twohig. One related to a mailing sent to Patty Marcinko, who was Twohig's sister. The final count related to Thomas Lamke, who was Twohig's former boyfriend. Before trial, Schwebke signed a stipulation admitting that he had compiled and mailed the envelopes to these individuals. The three victims—Twohig, Marcinko, and Lamke—testified on behalf of the State at trial. Schwebke neither testified nor presented any witnesses. The trial revealed the following facts concerning the three victims.

A. Twohig

¶ 6. In May 1996, Twohig received two manila envelopes in the mail. She received one at her home and the other at her place of work. Neither envelope had a return address. The mailing addresses on both envelopes were stenciled. Both envelopes bore 30th birthday greetings. Twohig's birthday is May 9. Both envelopes contained unsigned stenciled letters. The letter received at her home stated:

### THE HIGH SCHOOL YEARS

ROBBIE, NO DOUBT A VERY FINE YOUNG LADY

YOU WOULD HAVE MADE A LOVELY MISS TEEN WISCONSIN AND FAIREST OF THE FAIR

I'M SURE YOU WERE VERY POPULAR WITH ALL THE GUYS AND GIRLS IN HIGH SCHOOL AND ARE WELL LIKED BY ALL YOUR STUDENTS AT BHS

I WILL ALWAYS LOVE YOU, ROBBIE

The envelope then contained about 30 newspaper clippings of articles in which Twohig's name appeared. In

most of these articles, Twohig was not the primary focus of the article, but instead her name was one of several names listed in fine print. The clippings all related to activities in which Twohig participated while she was a high school student, including articles about 4–H awards, prizes won at the county fair, scholarships awarded, appearances in local theater productions, and participation in the Fond du Lac County "Fairest of the Fair" competition.

¶ 7. The letter sent to Twohig's workplace contained the following letter:

## THE COLLEGE YEARS

ROBBIE WAS NO DOUBT A VERY INTERESTING YOUNG WOMAN

I'M SURE YOU WERE VERY POPULAR AT UW-FDL AND UW-O

YOU MUST HAVE HAD A LOT OF FUN IN FLORIDA WITH YOUR BUBBLY PERSONALITY

SPAIN MUST HAVE BEEN A REAL LEARNING EXPERIENCE ALSO

YOUR NEIGHBORS MUST THINK THAT YOUR [sic] A VERY NICE PERSON

I WILL ALWAYS LOVE YOU ROBBIE

Like the envelope received at her home, this envelope also contained clippings of newspaper articles, 21 in total, in which Twohig's name was mentioned. Again, Twohig was not the focus of any of the articles, but instead her name was mentioned along with the names of several others. All of the articles related to activities in which Twohig participated while she was a college student.

9

¶ 8. Twohig testified that she felt "completely violated" by these mailings at her home and her work. She stated that "[t]o have someone keep this meticulous track of what you did over half your life ago, it's a feeling of violation that is almost indescribable." Twohig immediately contacted the police after receiving these mailings.

¶ 9. In September 1996, Twohig received another manila envelope at the school where she worked. The envelope had a stenciled address like the May 1996 mailings, but had no return address. The envelope contained a stenciled letter that stated "I want to share two of my favorite records with you[.] I love you Robbie[.]" Two 45 RPM records were contained in the envelope. One of the records was entitled "Roberta," Twohig's first name. The second record was entitled "Every Breath You Take." The label on the opposite side of the record had been blackened.

¶ 10. Twohig testified that she was familiar with the lyrics of "Every Breath You Take," which was a very popular song in the early 1980s.[2] She also testified that

---

[2] At trial, the song's lyrics were admitted into evidence:

Every breath you take, Every move you make, Every bond you break, Every step you take, I'll be watching you.

Every single day, Every word you say, Every game you play, Every night you stay, I'll be watching you.

O can't you see, You belong to me, How my poor heart aches, With every step you take.

Every move you make, Every vow you break, Every smile you fake, Every claim you stake, I'll be watching you.

Since you've gone I've been lost without a trace, I dream at night I can only see your face, I look around but it's you I can't replace, I feel so cold and I long for your embrace, I keep crying baby, baby please.

10

she was very disturbed to receive this song, stating that "whoever sent it was taking every step they could to make sure that I knew they still had an eye on me and still knew what I was doing." Twohig contacted the police after receiving this mailing as well.

¶ 11. In January 1997, Twohig received another envelope at the school where she worked. Like all the previous mailings, the address was stenciled. The envelope again contained two 45 RPM records and a piece of paper with the stenciled words, "I will always love you Robbie." Both records again had the labels blackened on one side. The legible labels were for the songs, "I Wonder What She's Doing Tonight" and "Green-Eyed Lady." Twohig again informed the police when she received this mailing.

¶ 12. In February 1997, Twohig received another envelope at the high school where she worked. Again, the envelope bore a stenciled address. It also contained a hand-written notation, stating "FRAGILE Open on Valentine's Day." The envelope contained a silk rose, a 45 RPM recording of the song "Hot For Teacher," and a blank piece of paper. Twohig again contacted the police after receiving this mailing.

¶ 13. Twohig testified that she became "more frightened [with each mailing], looking over her shoulder twice as many times, taking twice as many precautions. It was terrible to be in such fear day after day going to the mailbox seeing a manila envelope." Twohig

O can't you see, You belong to me, How my poor heart aches, With every step you take.

Every move you make, Every vow you break, Every smile you fake, Every claim you stake, I'll be watching you.

Every move you make, Every step you take, I'll be watching you, I'll be watching you.

told family members about the mailings she received. Twohig testified that the mailings had an effect on her friends and family, that everyone was taking precautions to protect her, including making sure that everything she received was legitimate. She described her parents as "distraught" and other family members as beside themselves. Marcinko testified that she was concerned about Twohig because it was affecting Twohig's work and all aspects of her life. Lamke testified that he became fearful for Twohig's safety when he learned about the mailings.

¶ 14. The mailings caused Twohig to make significant changes in her life. She moved several times over a period of a few years. She changed her telephone number to an unlisted number and subscribed to Caller ID service. She told her family, friends, and co-workers that they should not give out information about her. She and her family also consulted with experts on harassment.

B. Marcinko

¶ 15. Schwebke also sent anonymous mailings to Patty Marcinko. In particular, on February 22, 1997, she received two manila envelopes, one sent to her home and the other sent to the junior high school where she worked. Both envelopes bore stenciled addresses and a 34th birthday greeting and had no return address. The envelope sent to her home contained a stenciled letter that said:

UW-OSHKOSH DAYS AND BEYOND......

YOU WOULD HAVE MADE A GOOD MISS FOND DU LAC

REVEREND ANTHONY SCANNELL DID AN EX-
CELLANT [sic] JOB PRESIDING OVER YOUR WED-
DING CEREMONY IN 1994

The envelope also contained 25 newspaper clippings that mentioned Marcinko, including articles about her wedding, family events, academic achievements, and her participation in local theater productions.

¶ 16. The envelope sent to Marcinko's workplace also contained a stenciled letter and newspaper clippings. The letter said:

CAMPBELLSPORT H.S. AND UW-FDL DAYS

WHAT DO. . . .

BURGER KING, HARDEES, THE EXCLUSIVE COM-
PANY & UW-O ACADEMIC STAFF

. . . . . ALL HAVE IN COMMON?

Marcinko had worked at Burger King (a restaurant), the Exclusive Company (a retail record store) and the University of Wisconsin at Oshkosh (UW-O). The 37 newspaper clippings in the envelope dated to the early 1980s and described various events in Marcinko's life as a high school and college student.

¶ 17. Marcinko testified that, when she received the mailing at school, she contacted her principal and they called the police. Marcinko stated that she found the mailings threatening in light of the mailings that her sister had received. Marcinko also testified that her husband was concerned that Twohig's harasser had taken the next step by harassing Twohig's immediate family. Marcinko also stated that her parents found the mailings to her overwhelming in light of Twohig's history with harassment.

## C. Lamke

¶ 18. Schwebke also sent anonymous mailings to Thomas Lamke. Prior to October 1996, Lamke received unrequested gay literature at his home and workplace at Racine County Sheriff's Department. He testified that, as a result of these mailings, he was subjected to "pretty substantial ridicule" from other members of the sheriff's department. In October 1996, Lamke received a manila envelope with a stenciled address and no return address mailed to his workplace. The envelope contained a blank piece of paper and two 45 RPM records. The recordings were of the songs, "Where The Boys Are" and "San Francisco (Be Sure To Wear Some Flowers In Your Hair)." Lamke testified that these records bothered him because he believed that the titles had "something to do with homosexuality." He also testified that these mailings affected his relationship with his co-workers. He did not contact the police until over a month later, after learning that Twohig had also received such mailings.

¶ 19. At the close of the State's case, Schwebke argued that the evidence was insufficient to prove either of the elements of disorderly conduct. The court denied the motion, finding that there was sufficient evidence to permit the jury to find Schwebke guilty beyond a reasonable doubt. The jury later convicted Schwebke on all six counts.

¶ 20. Schwebke appealed his conviction and his sentence. In a published decision, the court of appeals affirmed the judgment of conviction, but reversed the sentence based on an error in imposing consecutive terms of probation.[3] *State v. Schwebke,* 2001 WI App 99,

---

[3] The State did not seek review of the court of appeals' decision related to sentencing. For this reason, we do not discuss it here.

¶ 1, 242 Wis. 2d 585, 627 N.W.2d 213. Applying a sufficiency of the evidence standard of review, the court first concluded that the evidence supported the jury's findings that Schwebke violated the disorderly conduct statute. *Id.* at ¶¶ 19–20. The court noted that the first element was met, that is, that the defendant had engaged in "otherwise disorderly" conduct, stating that "a jury could reasonably find that Schwebke's conduct of sending these types of repeated, unwelcome and anonymous mailings rises to the level of 'otherwise disorderly conduct.' " *Id.* at ¶ 20. It also found that the second element was met, that is, that the conduct occurred under circumstances that tended to cause or provoke a disturbance. The court stated: "The predictable and the actual result of Schwebke's antisocial conduct was to menace and disrupt the lives of Twohig, her friends and family. Schwebke's conduct was *significantly disturbing,* permeating the lives of not only the recipients of his mailings but those who were close to the recipients." *Id.* at ¶ 22. The court also emphasized the important factual circumstances surrounding Schwebke's conduct, stating:

> In some other circumstances, mailing anonymous letters and newspaper clippings might not constitute disorderly conduct. However, we do not consider Schwebke's mailings in a vacuum. Instead, we consider his mailings in the context of the harassment previously endured by Twohig and Lamke. In addition, we note that Marcinko and Lamke, along with friends and family, were aware of these more current mailings and of the previous harassment that Twohig had experienced. Twohig, in turn, knew that both her sister and her friend had now become targets of harassment and she testified that this greatly disturbed her. The mailings sent a clear message that someone was following the recipients' every move. That message not only

15

"tended to cause a disturbance," it did in fact deeply disturb the lives of Schwebke's victims and those close to the victims. Again, it was reasonable for a jury to find that Schwebke's mailings were sent under circumstances that tended to cause or provoke a disturbance.

*Id.* at ¶ 23.

¶ 21. We granted Schwebke's petition for review. Schwebke argues that his case presents more than a simple question of whether the evidence presented was minimally sufficient to permit the jury to convict, which was the question addressed by the court of appeals. Instead, the underlying issue is whether, based on the undisputed facts presented at trial, the disorderly conduct statute can, as a matter of law, apply to his conduct. To answer this question, he asserts that we must analyze the language, history, context, and constitutional principles that inform the interpretation of the disorderly conduct statute. When viewing all of these factors, Schwebke argues that we must conclude that the disorderly conduct statute cannot apply to his conduct.

¶ 22. In response, the State argues that only the question of whether the disorderly conduct statute applies to private mailings is a question of law because it is an issue of statutory construction. The State contends, however, that the ultimate issue remains whether the facts presented at trial were sufficient to constitute disorderly conduct. This issue, argues the State, must be reviewed under a sufficiency of the evidence standard. When proceeding in this manner, the State asserts that we must affirm the court of appeals' decision that upheld Schwebke's conviction under the statute.

¶ 23. Our two-step analytical framework is as follows. We first address Schwebke's arguments per-

taining to whether the disorderly conduct statute can be applied to his private mailings. We conclude that the statute may be applied to such conduct. We then examine whether the evidence presented at trial was sufficient to convict Schwebke under all six counts. We conclude that the evidence was sufficient. Accordingly, we affirm the court of appeals' decision.

## II

¶ 24. Wisconsin Stat. § 947.01 (1999–2000)[4] states as follows: "Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor." The State must prove two elements to convict a defendant under this statute. *State v. Douglas D.*, 2001 WI 47, ¶ 15, 243 Wis. 2d 204, 626 N.W.2d 725. "First, it must prove that the defendant engaged in violent, abusive, indecent, profane, boisterous, unreasonably loud, or similar disorderly conduct." *Id.* "Second, it must prove that the defendant's conduct occurred under circumstances where such conduct tends to cause or provoke a disturbance." *Id.* An objective analysis of the conduct and circumstances of each particular case must be undertaken because what may constitute disorderly conduct under some circumstances may not under others. *See State v. A.S.*, 2001 WI 48, ¶ 33, 243 Wis. 2d 173, 626 N.W.2d 712. Schwebke argues that the statute cannot be applied to the private mailings that he sent in this case. He bases his

---

[4] All subsequent references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise indicated.

17

argument on the statutory language, its legislative history and statutory framework, and the constitutional principles surrounding the statute. We address each basis for his argument in turn.

A. Statute

¶ 25. Schwebke first points to the language of the statute and our interpretation of this language to show that the statute cannot be applied to his conduct. In this case, the State charged Schwebke under the "otherwise disorderly" provision. We have interpreted this provision to "mean conduct of a type not previously enumerated but similar thereto in having a tendency to disrupt good order and to provoke a disturbance." *State v. Givens,* 28 Wis. 2d 109, 115, 135 N.W.2d 780 (1965); *see also City of Oak Creek v. King,* 148 Wis. 2d 532, 540–41, 436 N.W.2d 285 (1989). As mentioned, the statute also requires that such conduct must have occurred under circumstances that tended to cause or provoke a disturbance. Schwebke argues that the statute cannot be applied to his conduct because his conduct was not of the type that tends to disrupt "good order" or provoke a "disturbance." He asserts that, as we have interpreted it, "otherwise disorderly" conduct must have a tendency to disrupt "public order" and to provoke a "public disturbance." He contends that his conduct did not have the likelihood of causing such a disruption or disturbance. Instead, it merely had a tendency to cause the recipient of the mailing to be personally upset. Such personal and private annoyance, Schwebke contends, is insufficient to support a conviction of disorderly conduct. There must be, he asserts, "something much more threatening to 'order' in a public sense than mere personal discomfort." There must at least be conduct

18

that will likely provoke a response that "threaten[s] to spill over and disrupt the peace and tranquility of the surrounding community."

¶ 26. This argument requires us to examine and define terms under the disorderly conduct statute. We specifically examine the meaning of a disruption to good order and a disturbance. This examination requires an interpretation of the statute. Interpretation of a statute is a question of law that we may decide de novo. *Douglas D.*, 2001 WI 47, ¶ 14. Our goal in interpreting a statute is to discern the intent of the legislature. *State v. Piddington*, 2001 WI 24, ¶ 14, 241 Wis. 2d 754, 623 N.W.2d 528. In determining legislative intent, we begin with the plain language of the statute. *Id.* At the outset we note that the plain language of the statute does not specifically require a "public" disturbance. Instead, the statute only requires "a disturbance." Along these lines, all that we have required for a disruption is one that affects "good order;" we have not specifically required a disruption to "public order." Certainly, the failure to use such a modifier suggests that the statute does not require the conduct to necessarily reach the public in some capacity.

¶ 27. Schwebke attempts to further define the type of disruption and disturbance required under the statute, claiming that there must be some public element to such a disruption or disturbance. He claims that his argument is supported first by language from our previous opinions that have suggested that what is required are disruptions affecting the public or community. *See, e.g., Douglas D.*, 2001 WI 47, ¶ 24 (The disorderly conduct statute is intended "to root out conduct that unreasonably disturbs the public peace."); *State v. Zwicker*, 41 Wis. 2d 497, 508, 164 N.W.2d 512

(1969) ("Wisconsin's disorderly conduct statute pro-
scribes conduct in terms of results which can reason-
ably be expected therefrom, rather than attempting to
enumerate the limitless number of anti-social acts
which a person could engage in that would menace,
disrupt or destroy public order."). However, Schwebke
merely highlights language that discussed generally the
overall purpose of the disorderly conduct statute. Our
discussions have never specifically injected a public
element into the statute.

¶ 28. Schwebke also points to this court's juris-
prudence relating to the disorderly conduct statute to
support his argument. Specifically, he argues that we
have traditionally upheld disorderly conduct convic-
tions only where there has been a threat to public order
or public peace. Reviewing our previous disorderly
conduct cases, we acknowledge that there has always
been some public aspect in each of these cases.[5] Schwe-

---

[5] *State v. A.S.*, 2001 WI 48, 243 Wis. 2d 173, 626 N.W.2d 712
(juvenile's threatening comments at public youth center consti-
tuted disorderly conduct under the circumstances); *City of Oak
Creek v. King*, 148 Wis. 2d 532, 436 N.W.2d 285 (1989)
(newsperson's refusal to obey police command at scene of
helicopter crash constituted disorderly conduct); *State v. Elson,*
60 Wis. 2d 54, 208 N.W.2d 363 (1973) (defendant's loud conduct
in a state mental hospital was disorderly conduct); *State v.
Becker,* 51 Wis. 2d 659, 188 N.W.2d 449 (1971) (defendant's
violent conduct against police officer in public department store
constituted disorderly conduct); *State v. Maker,* 48 Wis. 2d 612,
180 N.W.2d 707 (1970) (defendant's stage performance in a
crowded tavern constituted disorderly conduct); *State v.
Zwicker,* 41 Wis. 2d 497, 164 N.W.2d 512 (1969) (public demon-
strations at university constituted disorderly conduct); *Lane v.
Collins,* 29 Wis. 2d 66, 138 N.W.2d 264 (1965) (abusive language
against police officer causing retaliatory conduct leading to a
breach of the peace may constitute disorderly conduct); *State v.*

20

bke particularly highlights *Douglas D.,* in which we held that the disorderly conduct statute could apply to a threatening communication from a student to a teacher. That case involved a student essay that implicitly threatened to cut off the teacher's head. *Douglas D.,* 2001 WI 47, ¶¶ 6–7. We concluded that, even though the conduct involved a private interaction between the teacher and student, the disorderly conduct statute could apply, not because it caused the teacher to become upset, but instead because the threat jeopardized the proper functioning of the school itself, which was regarded as a threat to public order. *Id.* at ¶ 28.

¶ 29. However, simply because the cases before us have all involved disturbances on a public level does not mean that the statute cannot be applied in instances where the disturbance is private in nature. Indeed, as the State points out, there have been some cases involving domestic disputes where the defendants were convicted under the statute, even though the conduct apparently did not involve a threat to disturb the public at large. *See, e.g., State v. Vinje,* 201 Wis. 2d 98, 548 N.W.2d 118 (Ct. App. 1996); *State v. Leprich,* 160 Wis. 2d 472, 465 N.W.2d 844 (Ct. App. 1991). In particular, in *Vinje,* Kevin Vinje was arrested after the police witnessed him pushing his wife. *Vinje,* 201 Wis. 2d at 101. Kevin was charged and convicted for disorderly conduct and intimidation of a witness. *Id.* Although the opinion addressed whether Kevin could be convicted of intimi-

---

*Givens,* 28 Wis. 2d 109, 135 N.W.2d 780 (1965) (sit-in demonstration in public building was disorderly conduct); *Teske v. State,* 256 Wis. 440, 41 N.W.2d 642 (1950) (acts of pickets during public strike were disorderly conduct). *Compare State v. Werstein,* 60 Wis. 2d 668, 211 N.W.2d 437 (1973) (mere presence in military recruitment office and mere refusal to obey a police command was not disorderly conduct).

dating a witness when the underlying crime is disorderly conduct, the court of appeals noted that disorderly behavior was present. *Id.* at 100–04. The facts in the opinion do not suggest that there was any threat to disturb the public order or peace or that there was any potential for a disturbance to spill over into the community itself. *Id.* at 100–01. Thus, even though our jurisprudence traditionally has applied the statute only to instances where the disturbance takes on a public nature, the statute's reach has not been limited in this respect.

¶ 30. We certainly agree with Schwebke that, from our jurisprudence, the statute is appropriately applied in instances where conduct, under the circumstances, has a tendency to provoke a disruption to the public peace, public safety, or public order or is likely to cause a reaction from the community based on the fact that the public peace, public order, or public safety is being threatened. We conclude, however, that the disorderly conduct statute does not necessarily require disruptions or disturbances that implicate the public directly. The statute encompasses conduct that tends to cause a disturbance or disruption that is personal or private in nature, as long as there exists the real possibility that this disturbance or disruption will spill over and disrupt the peace, order or safety of the surrounding community as well. Conduct is not punishable under the statute when it tends to cause only personal annoyance to a person. *See Douglas D.,* 2001 WI 47, ¶ 27. An examination of the circumstances in which the conduct occurred must take place, considering such factors as the location of the conduct, the parties involved, and the manner of the conduct.

¶ 31. Schwebke also argues that it is the state's interest in maintaining peace and order in the community that permits the state to punish such conduct under the disorderly conduct statute. Indeed, we have noted that " '[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order appears, the power of the State to prevent or punish is obvious.' " *A.S.*, 2001 WI 48, ¶ 14 (quoting *Feiner v. New York*, 340 U.S. 315, 320 (1951)). For this reason, Schwebke argues that the disorderly conduct statute cannot be stretched to apply to conduct that does not pose any threat to public order or safety. We do not construe this language from *A.S.* as prohibiting the disorderly conduct statute from being applied to conduct that tends to cause or provoke a disturbance that is private or personal in nature. This language merely states that prohibiting conduct that poses a threat to the public is obvious. Nevertheless, we conclude that the disorderly conduct statute requires, at a minimum, that, when the conduct tends to cause or provoke a disturbance that is private or personal in nature, there must exist the real possibility that this disturbance will spill over and cause a threat to the surrounding community as well. In this respect, the state's interest in maintaining peace and order in the community is not limited only to threats of riots or interference with traffic upon public streets. Certainly, as in domestic disputes, even though the disturbance may only occur on a private level, such conduct affects the overall safety and order in the community, and the state has an interest in regulating this conduct as well.

¶ 32. Based on this analysis, we conclude that the disorderly conduct statute was appropriately applied to

Schwebke's conduct in this case. In each instance, the conduct at issue, in light of the circumstances, went beyond conduct that merely tended to annoy or cause personal discomfort in another person. In each instance, the mailings constituted conduct that not only caused disturbances to the lives of the recipients, but the conduct was of the type that would be disruptive to peace and good order in the community. The disturbing nature of the conduct toward Twohig is the most obvious. The repeated mailings displayed obsessive behavior on the part of Schwebke that he was observing every aspect of Twohig's life. The subsequent mailings exacerbated the disturbing nature of this first mailing. The mailings to Marcinko were similar and were especially disturbing to Marcinko in light of the recent mailings that her sister received. The mailings to both women were also of the type that tended to be disruptive to the community itself, causing other friends and relatives to become concerned for the safety of the women. Such circumstances obviously necessitate the involvement of the police, and in both instances, the police were contacted. Finally, the October 1996 mailing sent to Lamke constituted conduct that tended to cause more than mere personal discomfort. This mailing followed other unwelcome anonymous mailings received by Lamke. Considering the mailings sent to Twohig and Lamke's prior intimate association with Twohig, the repeated mailings to Lamke, conveying animosity toward Lamke, would certainly tend to cause Lamke and others to be concerned for his safety. The conduct also affected Lamke's relationship with his co-workers. On the whole, such conduct necessitates the involvement of the police, and the police were contacted. For this reason, we conclude that the application of the disorderly conduct statute in this case was appropriate.

24

## B. Legislative History

¶ 33. Schwebke next argues that the legislative history reveals that the legislature never intended the disorderly conduct statute to apply to the conduct at issue in this case. He asserts that, when the legislature adopted the current version of the disorderly conduct statute, the legislature considered harassing conduct, but did not contemplate that such conduct would be covered by the statute.

¶ 34. Schwebke's argument looks first to a proposed version of the disorderly conduct statute from the Legislative Council Judiciary Committee and the comments on this version.[6] The comments specifically discussed whether annoying telephone calls would be covered under the proposed statute:

> The words "violent, abusive, indecent, profane, boisterous, unreasonably loud . . . conduct" give certainty to the crime while at the same time being broad in scope. On the other hand, they are not broad enough to take care of every situation generally considered to be disorderly. *Suppose, for example, that the actor solely for*

---

[6] The proposed version stated as follows:

347.01 DISORDERLY CONDUCT. Whoever does any of the following, whether in a public or private place, may be fined not more than $100 or imprisoned not more than 30 days:

(1) Engages in violent, abusive, indecent, profane, boisterous, unreasonably loud, or otherwise disorderly conduct under circumstances in which such conduct tends to cause or provoke an immediate disturbance of public order or tends to disturb or annoy others; or

(2) Intentionally causes, provokes, or engages in a fight other than a bona fide athletic contest.

5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 208 (1953).

*the purpose of annoying another person persists in calling that person on the telephone at all hours of the night. It might be difficult to fit this situation within the specific words above quoted, but there is no difficulty in holding that it is conduct which is "otherwise disorderly" and that the circumstances are such that the conduct tends to disturb or annoy others . . .*

5 Wisconsin Legislative Council, *Judiciary Committee Report on the Criminal Code* 208 (1953) (emphasis added). Schwebke argues that the legislature revised the proposed language in 1955 and that this revision reflected that the legislature disagreed with this viewpoint. The revision specifically deleted the proposed subsection (2) and instead adopted an alternate subsection that expressly covered the telephone scenario described above. The new subsection defined disorderly conduct to include anyone who "[w]ith the intent to annoy another, makes a telephone call, whether or not conversation ensues." Wis. Stat. § 947.01(2) (1955). This change, argues Schwebke, shows that the legislature did not believe that annoying telephone calls were already covered by the general definition of "otherwise disorderly conduct."

¶ 35. Schwebke also points to action taken by the legislature in 1979 to support his argument. He states that the legislature considered redefining the language in subsection (2) to include telephone calls made "with the intent to abuse, threaten or harass." LRB 3076/2, 1979 A.B. 507. He notes, however, that the legislature rejected this redefinition alternative and instead removed subsection (2) from the disorderly conduct statute altogether, creating a separate harassment statute that included a separate offense for unlawful use of the telephone. §§ 2–3, ch. 131, Laws of 1979. This statute requires a showing that the offending telephone calls

were made with the intent to frighten, intimidate, threaten, abuse or harass. *Id.* at § 3. The legislature subsequently adopted other specific harassment statutes. *See* Wis. Stat. §§ 813.125 and 947.013. Overall, Schwebke argues that these changes indicate that the legislature intended that the disorderly conduct statute would not apply to harassing conduct, like the conduct at issue in this case. The harassment statutes would apply instead.

¶ 36. Despite this history, Schwebke's argument is flawed because it assumes that harassment and disorderly conduct are mutually exclusive. As the State contends, when conduct falls within the definition of disorderly conduct, it may be prosecuted under that statute as well as under the harassment statute. The history certainly indicates that the legislature intended to create a separate statute to cover harassing conduct; however, prosecutors are afforded broad discretion in charging criminal conduct. *See Sears v. State,* 94 Wis. 2d 128, 133, 287 N.W.2d 785 (1980). For this reason, we decline to limit the prosecutor's discretion in this instance.

C. Constitutional Considerations

¶ 37. Schwebke also argues that the legislature could not have intended the disorderly conduct statute to apply to the conduct at issue in this case based on constitutional principles. Indeed, as Schwebke points out, the legislature repealed the specific annoying telephone calls provision from the disorderly conduct statute and created a new more specific provision after the court of appeals concluded that the language was overly broad. *See State v. Dronso,* 90 Wis. 2d 110, 117, 279 N.W.2d 710 (Ct. App. 1979). To address any constitu-

tional concerns, argues Schwebke, the legislature repealed the disorderly conduct provisions related to private harassment or annoyances and instead created more narrowly tailored harassment statutes. *See* Wis. Stat. §§ 947.012 and 947.013. Schwebke contends that, by creating these separate and more narrowly tailored provisions, the legislature intended any harassing conduct, like the conduct in this case, to be charged under this provision, not under the broad language of the disorderly conduct statute. Specifically, he asserts that "by applying the general disorderly conduct provisions to Mr. Schwebke's conduct, the state attempts to do that which the more narrow private nuisance provision was too broad to accomplish within constitutional bounds."

¶ 38. It is reasonable to conclude that the legislature reacted to the decision in *Dronso* in removing the telephone call provision from the disorderly conduct statute and revising it to create a new telephone harassment statute. This action certainly reflects that the legislature sought a more specific statute in the event that conduct, like that in *Dronso,* would not escape prosecution based on constitutional concerns and that the disorderly conduct statute may not be sufficiently narrowly tailored to apply to certain types of harassing speech. However, that is not to say that the legislature intended that all conduct that may be characterized as harassing in nature, such as Schwebke's conduct, must be prosecuted under the harassment statute. Further, although Schwebke characterizes his mailings as "communications," the prosecution of the content of his speech in this instance is merely incidental to the prosecution of his overall conduct. This conduct consisted of repeated mailings to related recipients containing unwelcome gifts and numerous newspaper clip-

28

pings. Because the content of the mailings is not being directly prosecuted, concerns of overbreadth are not implicated in this instance. Even if they were, Schwebke never raised such a constitutional challenge either here, in the circuit court, or in the court of appeals. For this reason, we decline to address the overall constitutionality of the statute in this case.

¶ 39. Schwebke also asserts that the current harassment statutes, unlike the disorderly conduct statute, require a showing of an intent to annoy or harass and are limited to particular types of harassing communications. Because the disorderly conduct statute does not include such language, it cannot apply to the conduct at issue in this case without running into concerns of vagueness. *See Bachowski v. Salamone,* 139 Wis. 2d 397, 408, 407 N.W.2d 533 (1987) (upholding the harassment statute on a challenge of vagueness in part because the statute narrowed the meaning of harassment to conduct that was "intended to harass"). We disagree. Such vagueness concerns are not presented by the application of the disorderly conduct statute to Schwebke's conduct. The statute provided Schwebke with sufficient notice that his conduct would be deemed unlawful if it fell within the categories of the statute. The lack of an intent element in the statute might be of concern if the statute were applied only to Schwebke's speech. In this case, however, any concerns with respect to vagueness are without merit.

III

¶ 40. Having concluded that the disorderly conduct statute may be applied to Schwebke's conduct, we now review whether there was sufficient evidence to

convict Schwebke on the various counts in this case. *See State v. Duda,* 60 Wis. 2d 431, 439, 210 N.W.2d 763 (1973). The standard for reviewing the sufficiency of the evidence to support a criminal conviction is that a conviction will not be reversed unless the evidence, viewed most favorably to the State and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. *State v. Poellinger,* 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990).

¶ 41. Based on the evidence, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt in all cases. Again, the elements in this case required (1) otherwise disorderly conduct, which must be similar to the conduct enumerated in the statute in having a tendency to disrupt good order, and (2) under circumstances that tended to cause or provoke a disturbance.

¶ 42. The mailings sent to Robbie Twohig show an obsessive interest from an unidentified person in her life. Although the messages sent were not overtly threatening, the evidence showed a person who was obsessively interested in every detail of Twohig's life. The subsequent mailings exemplified the extent of the obsession, including songs that indicate the sender would perhaps be watching "every move she makes." Such conduct certainly has the tendency to disrupt the peace, safety, and good order because they were unwelcome advances and the extent of this obsession was abusive in nature. Under such circumstances, the conduct was likely to cause or provoke a disturbance because such conduct would cause concern from other members of the community, including the police.

30

¶ 43. In light of these prior mailings to her sister, a rational trier of fact could have also concluded that the mailings sent to Marcinko constituted disorderly conduct. These mailings also revealed an obsessive interest into Marcinko's life, with newspaper clippings dating back several years. In light of the fact that Twohig had received similar mailings, the anonymous mailings sent to Marcinko revealed that the sender's obsession was not limited to Twohig. Such calculated mailings caused concern from Marcinko's family, friends, and community for her safety and necessitated the involvement of the police.

¶ 44. Finally, a rational trier of fact could have concluded that the conviction for the October 1996 mailing to Lamke at his workplace also constituted disorderly conduct. This mailing followed other anonymous literature sent by Schwebke. The source of these mailings placed Lamke on edge because he knew someone was trying to upset him by sending numerous, unwanted mailings but Lamke did not know the source. The October 1996 mailing containing the records, the source of which was again unknown to Lamke, placed him further on edge because he then knew the previous mailings were not sent by mistake and that someone was consciously trying to upset him, especially after learning of Twohig's similar mailings. As noted, the mailings also affected Lamke's relationship with his coworkers. This repeated unwelcome interest, under the circumstances, was sufficient to cause or provoke a disturbance because it could have reasonably led to concerns of public safety for both Lamke and other members of the community. Schwebke's conduct necessitated, and resulted in, the involvement of the police.

## IV

¶ 45. In sum, we affirm the court of appeals' decision to uphold the convictions of Schwebke. The disorderly conduct statute can be applied to the private mailings involved in this case, and based on the facts presented in this case, there was sufficient evidence to convict Schwebke on the charges.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 46. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(dissenting)*. Glenn F. Schwebke has a lengthy history of harassing people. It used to be by phone. Now it is by mail. The recipients of the mailings were personally and traumatically disturbed by the defendant's conduct, and justifiably so. The legal system should, and can, help protect the victims from Mr. Schwebke.

¶ 47. The law provides remedies for these victims other than the disorderly conduct statute. These remedies are available and effective. In the circuit court, the State analyzed the available remedies in a document entitled "Dispositional Brief." The available remedies included obtaining a harassment restraining order and injunction;[1] charging Mr. Schwebke with

---

[1] A harassment restraining order and injunction were available under Wis. Stat. § 813.125 (1999–2000). (All subsequent references to the Wisconsin Statutes are to the 1999–2000 version, unless otherwise indicated.) If Mr. Schwebke had violated the injunction, he then would have been liable for criminal penalties under § 947.013(1r)(b).

The State recognized that the failure to get such an order in the present case weakened the State's case against the defen-

harassment;[2] or charging Mr. Schwebke with stalking.[3] Instead, the State chose to prosecute Mr. Schwebke under the disorderly conduct statute.

¶ 48. The State decided to prosecute under the disorderly conduct statute "because of the broad language of the law and the ability to charge each and every incident as a separate act. The State also surmised, since the instruction contemplates the actions being disorderly under the circumstances as they then and there existed, the door to the prior offense evidence would be open to show why the conduct here tended to create a disturbance."[4]

---

dant. An advantage to this order, according to the State, was that the defendant had in the past "conformed his conduct to the requirements of the law and not had any charges filed against him." The prior record demonstrates "there is no one who can tell this Court they know how to stop Mr. Schwebke from engaging in this conduct, except to say that when a court order is in effect, he has complied with it." At the time of his sentencing, the defendant had been out on bail for over two years and had made no attempt to contact any of the three recipients of his mailings.

[2] The State could have sought a civil forfeiture for harassment under Wis. Stat. § 947.013. A harassment conviction would have subjected the defendant under the circumstances of this case to a maximum forfeiture of $1000. The State concluded that a more severe penalty was needed.

[3] The State could have charged the defendant with stalking in violation of § 940.32. The problem with a stalking charge, according to the State, was that the mailings were juvenile and definitely annoying, but also complimentary in nature, thereby casting doubt on whether there could be a reasonable fear of bodily injury of great magnitude or death.

Although a deferred prosecution agreement was considered, the defendant refused to go forward with it.

[4] *See* the State's "Dispositional Brief" at unnumbered p. 6.

¶ 49. The question before us, however, is whether the State and this court can stretch the disorderly conduct statute, Wis. Stat. § 947.01,[5] to cover the facts of this case. The majority opinion says yes. I think not. Therefore, I dissent.

¶ 50. The majority opinion recognizes it is extending the reach of the disorderly conduct statute beyond where it has gone before. According to the majority opinion, a mailing that may be personally disturbing to the recipient but that is not "violent, abusive, indecent, profane, boisterous, or unreasonably loud"[6] can constitute "otherwise disorderly conduct" under Wis. Stat. § 947.01. Furthermore, this "otherwise disorderly conduct" constitutes a crime under the disorderly con-

---

According to the State, the defendant could face a maximum of $6,000 in fines plus court costs, four years' probation, and 540 days in county jail if convicted of six counts of disorderly conduct. The circuit court sentenced the defendant for each of the first three counts to 90 days in jail each, to run consecutively. On each of the last three counts, the circuit court sentenced the defendant to four-year probation terms, to be served consecutively.

Advocates across the country are urging the creation of state mental health courts modeled after drug courts. A mental health court would be more than an adjudicator of charges; it would take an active role in the mental health treatment of people coming before it. *See* LeRoy L. Kondo, *Advocacy of the Establishment of Mental Health Specialty Courts in the Provision of Therapeutic Justice for Mentally Ill Offenders,* 24 Seattle U. L. Rev. 373 (2000).

[5] Section 947.01 provides: "Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor."

[6] Wis. Stat. § 947.01.

34

duct statute because there is "the real possibility that this disturbance will spill over and cause a threat to the surrounding community as well." Majority op. at ¶ 31.

¶ 51. I agree with the defendant that the language of the statute, its legislative history, and the case law support the notion that disorderly conduct requires a threat to public order and does not apply to the kind of private harassment-type conduct involved in the present case. The majority opinion's interpretation of Wis. Stat. § 947.01 encompasses far too much conduct that the legislature could not have intended to include in the statute.

¶ 52. Virtually any antisocial or offensive conduct, including a mailing from one person to another, is now included within the parameters of the criminal disorderly conduct statute. Under the majority opinion, any disturbing private mailing, even though it is not "violent, abusive, indecent, profane, boisterous, or unreasonably loud,"[7] can be viewed as spilling over and causing a threat to the surrounding community, because it may be disturbing to those who are told of the private mailing. The majority opinion errs because "disturbing" does not a "disturbance" make! "Disturbing" has been conflated in the majority opinion with "disturbance."

¶ 53. The court seems to be moving the disorderly conduct statute back to the laws of the 1950s and 1960s that gave law enforcement officers and prosecutors broad discretion to arrest and prosecute people. Those laws are characterized as "so broad that they 'legally' authorize the police to arrest virtually anyone."[8]

[7] *Id.*

[8] Robert Force, *Decriminalization of Breach of the Peace Statutes: A Nonpenal Approach to Order Maintenance*, 46 Tul.

¶ 54. The legislature has wisely recognized that society requires laws to govern conduct related to the strains and stresses of people living in close proximity. The disorderly conduct statute is one such law. The majority opinion goes too far, however, by reading the disorderly conduct statute to cover the defendant's behavior in the present case.

¶ 55. The majority opinion's interpretation of the disorderly conduct statute will allow the disorderly conduct statute to be used to place in Wisconsin's already overburdened jails and prisons those, including the mentally ill, who privately disturb others while failing to provide those persons with appropriate treatment.

¶ 56. The record is clear that the defendant is suffering from a chronic mental illness. He lives at home with his elderly parents and receives social security disability benefits. He receives psychiatric care and medications, which at times abate his aberrant behavior. Nonetheless, the defendant's condition remains chronic and requires ongoing treatment. The defendant's conduct evinces the symptoms of his disease.

¶ 57. According to the National Association for the Mentally Ill, prisons and jails have become the mental hospitals of the 1990s.[9] A 1999 U.S. Department

L. Rev. 367, 399 (1972), quoted in Debra Livingston, *Police Discretion and the Quality of Life in Public Places: Courts, Communities, and the New Policing,* 97 Colum. L. Rev. 551, 596 (1997). For a discussion of these laws, see, for example, Debra Livingston, *Police Discretion,* 97 Colum. L. Rev. at 595–600.

[9] *See, e.g.,* LeRoy L. Kondo, *Advocacy of the Establishment of Mental Health Specialty Courts in the Provision of Therapeutic Justice for Mentally Ill Offenders,* 24 Seattle U. L. Rev. 373 (2000); Paul F. Stavis, *Why Prisons Are Brim-Full of the*

of Justice report revealed that 16% of the persons in state and local prisons and jails have a serious mental illness.[10] The result is crowded jails and inappropriate interventions for seriously mentally ill individuals who become subject to penal incarceration for conduct related to their mental illness. Indeed, the problem of overcrowding in Wisconsin's prisons and jails and the number of mentally ill people already in them is of concern to the people of the state of Wisconsin.[11] Using the "otherwise disorderly conduct" provision of Wis. Stat. § 947.01 with the majority opinion's expanded view of what conduct "tends to cause or provoke a disturbance" will merely exacerbate this problem.

¶ 58. Because the majority opinion has gone too far in its interpretation and application of the disorderly conduct statute, I dissent.

¶ 59. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

*Mentally Ill: Is Their Incarceration a Solution or a Sign of Failure?*, 11 Geo. Mason U. Civ. Rts. L.J. 157 (2000).

[10] Paul F. Stavis, *Why Prisons Are Brim-Full of the Mentally Ill: Is Their Incarceration a Solution or a Sign of Failure?*, 11 Geo. Mason U. Civ. Rts. L.J. 157, 159 (2000).

[11] *See, e.g., Who Holds the Key to the Jail Problem?*, Wis. State Journal, December 26, 2000, at 8A.